UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UKIAH ATKINS,

No. 1:13-cv-00956-CJS
DECISION AND ORDER

Petitioner,

-vs-

SUPT. PAUL CHAPPIUS,

Respondent.

---

## INTRODUCTION

On September 11, 2013, Ukiah Atkins ("Atkins" or "Petitioner") filed a *pro se* Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Section 2254"), challenging the constitutionality of the judgment entered against him on September 22, 2003, in New York State, Monroe County Court (Geraci, J.) following a jury verdict convicting him of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)).   ECF No. 1.   After the Petition was dismissed as untimely, ECF No. 7, the United States Court of Appeals for the Second Circuit granted a certificate of appealability, assigned counsel, vacated the judgment, and remanded the case for further proceedings, ECF No. 13. In particular, the Second Circuit directed this Court to determine whether Atkins has presented a credible "gateway" claim of actual innocence based on the existence of an alleged alibi witness, Latresha Fuller ("Fuller"), to allow his untimely habeas claims to be heard on the merits.

For the reasons discussed below, the Court finds that Atkins cannot fulfill the requirements for a "gateway" claim of actual innocence.  Accordingly, the Petition must be dismissed as untimely.

1

# BACKGROUND

## I.    Petitioner's Trial

By Monroe County Indictment Number 2003-0146, Atkins was charged with one count of second-degree (intentional) murder (N.Y. Penal Law § 125.25(1)) and one count of second-degree (depraved indifference) murder (N.Y. Penal Law § 125.25(2)). The charges stemmed from the March 18, 2003 shooting death of Bernea Porter, a/k/a "Shay," in the City of Rochester. Atkins' jury trial was conducted from August 25, to August 29, 2003, in Monroe County Court (Geraci, J.) ("the Trial Court").

### A.  The Colloquy Regarding the Notice of Alibi

Prior to the opening of the proofs on August 25, 2003, there was a colloquy regarding whether the defense would be calling Atkins' then-girlfriend, Fuller, as a potential alibi witness.  In that regard, as will be discussed further below, on March 29, 2003, eleven days after the murder, investigators with the Rochester Police Department ("RPD") had questioned Atkins and taken a written statement from him.   In his statements to the investigators, Plaintiff had indicated that he was with Fuller at the time of the shooting, which took place at approximately 8:00 p.m.  During a pause in the interview, the officers spoke by telephone with Fuller, and then made the following notation, in pertinent part:

> Inv. Galetta again tried to contact Fuller by calling her cell phone. (Atkins provided the number as [xxx-xxxx]).  RI did speak to Fuller during which time se explained that Atkins was with her the week before.  RI trjed to obtain any specific outing, time, or landmark they would have been out together which she could not provide.  With the exception of getting movies at Blockbuster, she couldn't recall any specific outing during the time they were together.  She ended up making the blanket alibi that Atkins was with her every night, all the time.

Subsequently, prior to the opening of proofs at trial, there was a discussion between the court and counsel as to which parts of Atkins' written statement the prosecution would be allowed to introduce, during which defense counsel stated:

> [TRIAL COUNSEL]: The second issue I have regarding the statement is that part of the conversation that took place between Investigator Galetta and my client and I believe at that point it was Investigator Weather was still present, my client indicated that he had been with another person [i.e., Fuller] during the previous week, that the police officers made effort to contact that person. In essence, what this is is an alibi. We have not sought to offer an alibi defense. We have made no notice of that and it's our position that should not come out in front of the jury in essence requiring us to prove something that we are not required to prove regarding that alibi and it's our position that the People's witnesses should be precluded from referring to that portion of my client's statement and that effort to verify that particular issue. . . .

T.26.[1] The Trial Court indicated that it would allow the prosecutor to have the police investigators testify as to what they were told by Atkins and what they did in response to that, "but obviously any substance of that conversation [with] that individual would not be able to be testified to." T.28.  In response, Trial Counsel argued that

> once you open that door to him saying I was with this woman all week long, and it's been basically a defense strategy that we have come to, that we are not offering an alibi in this particular case. You have then put it in their minds that if he was with someone all week long, why didn't we hear from that person, the police talked to him, and I think that is very prejudicial if this portion of it comes in. . . .

T.29 (emphasis supplied). As a compromise, Trial Counsel proposed that the investigators be permitted to testify only that "the Defendant made statements that an individual would have information regarding this matter[,]" and "the police then interviewed that person[.]" T.32; *see also* T.34.

---

[1]     Citations to "T." refer to pages from the transcript of Petitioner's trial, which is contained in two volumes of exhibits (ECF Nos. 11 & 11-1) filed by Respondent. The trial transcript begins at page 142 of 419 of ECF No. 11. Pages 1 to 141 of ECF No. 11 are the transcripts of the pre-trial proceedings.

When the Trial Court stated that it would not redact the portion of the statement where Atkins stated he had "been with this girl Latrece [sic] Fuller from Sunday to Thursday," T.34-35, Trial Counsel changed tack and requested that Fuller be added to the defense witness list. T.35. The prosecutor objected, noting that Trial Counsel had not filed a timely notice of alibi.  T.36. Trial Counsel responded that she had not filed a notice of alibi because it was her belief, based on her research, that "because the alibi [was] basically being offered by the People, that that [reference to Fuller] would be redacted." T.36-37. Trial Counsel also argued that since the prosecution clearly had notice of Fuller's existence, and their investigator had spoken with her, it was not an unfair burden on the People to allow a late notice of alibi. T.36-37. The Trial Court reserved decision. T.38. At the end of colloquy, the prosecutor pointed out that he had a recording of a jailhouse telephone call between Atkins and Fuller which he would seek to introduce should the defense call Fuller as an alibi witness. T.46.

### B.  The People's Case

Gregory Bowe ("Bowe") testified that on March 18, 2003, after getting home from work at about 5:45 p.m., he decided to go buy some crack cocaine. He left his apartment on Troup Street and headed to 706 West Main Street, where he had purchased crack on previous occasions. T.512-13. That day, Bowe testified, a "tall skinny black dude" named "Larry," and "two young uns" were selling crack out of Apartment 3 at 706 West Main. One of the "young uns" was "Shay," whom Bowe considered a friend, and the other was a "little blond white dude."  T.513-14; 528. Bowe bought his crack from the "young uns," went home, and smoked it. Bowe returned twice more to Apartment 3 to buy additional crack. T.514-15, 544-45.

On his final trip back to Apartment 3, Bowe testified that he met Atkins, a/k/a "K," on West Main Street T.515-16. Bowe had seen Atkins on "numerous occasions" because he used to buy drugs from Atkins out of a different apartment on the second floor of 706 West Main; the last time he did so was about a month earlier. T.522-24. Bowe admitted on cross-examination that he had offered to work for Atkins "running licks," i.e., bringing customers to him, and that he "ran licks" for Atkins "maybe" one time. T.536-37.

When Atkins commented to Bowe that he also was on his way to 706 West Main, Bowe informed him that "there was some young-uns up there doing their thing," i.e., selling drugs. T.516-17, 555. Bowe testified that Atkins inquired whether Shay was there; Bowe replied affirmatively. T.517, 555-56. According to Bowe, Atkins remarked that he was "going to teach them a lesson." T.517, 555-56. Bowe said he did not think much of Atkins' comment and continued on his way.

Once Bowe arrived at 706 West Main, he went out to the front staircase with Shay and Larry and they "screwed out," i.e., smoked their drugs. T.517-18. At some point, Bowe recalled, Larry left to go buy beer for them; Bowe and Shay remained on the staircase. T.517-18, 559, 561. Bowe testified that someone knocked on the door, and Shay went to answer it. T. 518-20, 563. Bowe stood up to follow her, explaining that as she went around the corner,  he almost immediately heard a "crack, like a gunshot," which made his "ears [start] ringing," and he saw a "flash." T.520, 532. Between the time Shay turned the corner and Bowe heard the gunshot, he did not hear her say anything and did not hear anyone else say anything. T.532.

Bowe then "hauled ass out" of the building and into the alleyway, nearly "collid[ing]" with Atkins, who was coming out of the side entrance of 706 West Main and holding a black handgun. T.520-22, 550. Bowe said that there was an outdoor light that was on, and he had

no problem seeing Atkins. T.522. Atkins did not say anything but ran down Wentworth Street, off of West Main. Bowe ran in the other direction. T.527-29, 534, 568.

Bowe stopped at his friend Richard's house, located around the corner on Wentworth Street, but Richard was not home. Bowe first ran down Troup Street, but decided it was too risky to go to his apartment. Bowe then returned to Jefferson and West Main Street. He admitted that before calling the police, he wanted to get a "blast [of crack] so [he] could clear [his] head," because he was "scared and nervous." T.575. He called 911 about two hours after the shooting and insisted on speaking with a sergeant rather than an officer; he eventually spoke to Investigators Gary Galetta and Glenn Weather and told them what he knew. T.530-34. At trial, Bowed stated that he had been living "incognito" until about two weeks prior to trial because he was "more or less afraid of getting [him]self killed." T.534-35.

Bowe admitted he had several previous convictions dating back to 1985—menacing with a weapon, possession of controlled substances, and attempted resisting arrest. He was currently on parole for a felony drug conviction. Bowe admitted that the police gave him the security deposit for his new apartment in the form of a cashier's check payable to the landlord and bought him some coffee and cigarettes "here and there." T.584-85.

Tyrone Rollins ("Rollins") testified that he lived in Apartment 7 at 706 West Main on March 18, 2003. That day, in the late afternoon, he heard an "extremely loud pop" "that shook the room"; before he could open the door to his apartment, he heard someone move down the hall "slowly." T.594, 596-98, 604-05. When he went out to the hall, he did not see anyone. He walked down the hall and saw Shay lying on the floor. Rollins said to her, "get your ass up," because they used to joke around, but Shay did not respond. When he went over to her, Rollins saw blood running out of her nose, and he screamed for "Junior," who

was coming up the stairs, to call the police. T.598. Rollins on occasion had seen "K" (Atkins) at 706 West Main, around the apartment across the hallway from his. T.600-01.

The building superintendent, Rudy Armstrong, Jr. ("Armstrong"), a/k/a "Junior," testified that on March 18, 2003, in the late afternoon, he was in his apartment on the basement level. He heard a loud "pop" which he at first thought was the television program he was watching with his girlfriend. When he realized it came from outside, he ran up the stairs and he found Shay lying on the floor of the hallway. Armstrong called the police. T.607-10.

Rochester Police Department ("RPD") Officers Christopher Muscato and Matthew Balch responded to call regarding a woman shot at 706 West Main Street. T.310-11. Officer Muscato discovered Shay, unresponsive, lying in the hallway. T.312-13. She had a massive facial gunshot wound and brain matter coming out of her ears. T.313.  Officer Muscato remained with her until ambulance personnel arrived. Shay was transported to Strong Memorial Hospital, where she was treated in the trauma unit; her neurological condition deteriorated, and she was declared brain dead the following day. T.391-93; 465-66; 488.

Eleven days later, on March 29, 2003, RPD Officer Joseph Graham, heard a radio transmission which prompted him to pull over Atkins in his car. He and his partner brought Atkins to the Public Safety Building in connection with the investigation into the shooting. T.713-16.

When Atkins arrived, RPD Investigators Gary Galetta ("Investigator Galetta") and Glenn Weather ("Investigator Weather") brought him to an interview room. The investigators had already spoken to Bowe and the residents of 706 West Main Street. T.627-30; 697. Investigator Weather issued the *Miranda* warnings to Atkins by reading them from a form.

According to Investigators Galetta and Weather, Atkins affirmed that he understood his rights and agreed to speak with the police. T.633-35; 698-700.

Atkins explained that he was unemployed and was "quite frank" that he was a drug dealer operating in the areas of West Main Street, Brown Street, and King Street. T. 636. Investigator Galetta described Atkins as "sweating profusely" and being "very talkative" throughout the interview. T.636-37.

When Investigator Galetta asked Atkins about his associates, Atkins mentioned that he sometimes "hung out with" Timothy Goode ("Goode") to smoke marijuana; he said that Goode lived "where that girl got killed." T.638-39. When Investigator Galetta asked Atkins which "girl" he was referring to, Atkins replied, "Shay" or "Shadow." T.639. At the time Atkins made that statement, Investigator Galetta had not informed Atkins why they were talking to him. T.638. Atkins told Investigator Galetta that Shay and Larry worked for Goode, finding customers for him. Atkins said that he had "no beefs" with any of them. T.639-40.

Investigator Galetta recounted thatad  Atkins then "steered" the conversation toward the "girl being killed," telling the investigators that he hheard "on the streets" that his name was being mentioned in connection with the incident. T.640. Atkins was not specific about what was being said or by whom. T.650. Investigator Galetta related that, according to Atkins, a woman named Stacey Williams ("Stacey"), a/k/a "Static," was having problems with Shay, and Atkins' name came up "as being on Stacey's side." T.640. Atkins said he did not know Stacey that well; he knew her through his cousin, who "went with" Stacey's sister. T.641.

Investigator Galetta asked Atkins if he was in the vicinity of the apartment when Shay was shot, and Atkins said that he had not been around 706 West Main Street for quite a while. T.642-43. Atkins explained that he had just returned from Florida the weekend before

and was staying with his girlfriend, Latresha Fuller ("Fuller") who lived at 211 Maplewood Avenue. He stayed at Fuller's from March 16th until March 20th, two days after the shooting. T.642-43.  During that period, on his way to a corner store on Jefferson to buy a "blunt", Atkins admitted that he drove by 706 West Main a couple times but never stopped at or went into the building. T.643-44. At that time, the investigators decided to memorialize Atkins' statement; Investigator Galetta typed it up, and Atkins read it and signed it. T.646-59.

Investigator Galetta testified that after Atkins signed the statement, they continued to talk with him about how he learned he was being mentioned as a potential suspect. T.649-50. Atkins told them that he heard on the night of the incident that his name was being mentioned, which concerned him. T.650. Atkins admitted for the first time that he stopped by 706 West Main the day after the shooting and talked to Larry and Rollins, who told him that they had heard his name as well as "other versions related to other possibilities." T.650. Atkins also told Investigator Galetta that he had had a brief romantic encounter with the victim, Shay, a while ago, when she was dating a friend of his. T.651.

During a break, Investigator Galetta called Fuller using the cell phone number provided by Atkins and spoke with her. When Investigator Galetta resumed the interview, he told Atkins that he had talked with Fuller. T.653.

Investigator Galetta also related that they spoke with Atkins about the "dope game" in the area of 706 West Main. Atkins said he was trying to get out of it and move to Florida to open a business with his family. T.654.

Investigator Galetta testified that he told Atkins he believed Atkins was involved in the shooting because someone had identified him; Atkins replied that it must be a case of mistaken identification. T.654-55. Atkins explained he had a "common look" because of the clothes he wore and claimed he had been mistaken for other people in the past. According

to Investigator Galetta, Atkins also "backed off" on how frequently he had been around 706 West Main. T.655.

When the conversation returned to the topic of Shay's rival, Stacey, Atkins commented that Stacey had been a "steerer" who brought customers to him, that she was a good worker, and that they were "pretty tight." T.656-57.   However, Atkins stated that Stacey used to get into fights with people because of her personality, and that  Atkins would "squash beefs" for her because she was valuable to him. Atkins told Galetta that a few days before the shooting,  Shay and Stacey had gotten into a fight in which Stacey hit Shay with a glass object and cut her over her left eye. T.657-58.

Investigator Galetta testified that Atkins "roughly identified" a number of residents in the building, which indicated to him that Atkins was more familiar with 706 West Main than what he said originally. Atkins described the residents as "geekers" and "fiends" who could not be trusted. T.660-61.

At the conclusion of the People's case, Trial Counsel successfully moved to dismiss the count of the indictment charging second-degree murder under a depraved  indifference theory. T.733-40.

### C. The Defense Case

Ultimately, the defense did not call any witnesses. Trial Counsel noted on the record, "My client and I have discussed that at length and it's our decision at this point to withdraw that  application that was made I believe on the first day of this trial. We will not be offering any alibi witness or any testimony whatsoever." T.742. The Trial Court confirmed with Atkins that he was waiving his right to testify. T.742-43.

### D. Verdict and Sentence

On August 29, 2003, the jury returned a verdict convicting Atkins of the count of the indictment charging intentional second-degree murder. T.844. On September 22, 2003, the Trial Court sentenced Atkins to an indeterminate term from 25 years to life in prison. 9/23/03 Tr. at 19-20.

## II.     Direct Appeal

Represented by new counsel, Atkins pursued a direct appeal. He argued that (1) the Trial Court erred in refusing to give a circumstantial evidence jury charge; (2) Trial Counsel was ineffective in conceding that the prosecutor was entitled to present evidence of Petitioner's uncharged crimes; and (3) the verdict was against the weight of the evidence. The Appellate Division, Fourth Department, of New York State Supreme Court ("Appellate Division") unanimously affirmed the conviction, denying all three claims on the merits. *People v. Atkins*, 39 A.D.3d 1230, 1230 (4th Dep't 2007). The New York Court of Appeals denied leave to appeal. *People v. Atkins*, 9 N.Y.3d 872 (2007).

## III.    Motion to Vacate the Judgment

In papers dated October 30, 2008, Atkins filed a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10(1)(h) ("440 Motion") in Monroe County Court ("the 440 Court"), asserting that Trial Counsel was ineffective in failing to (1) investigate his alibi defense (i.e., his girlfriend, Fuller), (2) file a timely notice of alibi, and (3) present any alibi witnesses at trial. SR.253-68. In support of the 440 Motion. Atkins submitted a notarized but unsworn statement from Fuller, signed on October 7, 2008, stating as follows:

> On the evening of Tuesday, March 18, 2003, Ukiah arrived at 211 Maplewood A venue, my home at approximately 8:00 pm as I was watching the beginning of the television show, American Idol. Ukiah came in the home and we proceeded to watch the show together.

Upon his arrest, I received a call on Saturday, March 29, 2003 from the Rochester Police Department in the early evening. At the time of the call, I was at a family function (birthday party), which I tried to explain to the police officer (male) before we went any further with the conversation. Thus, it was hard to hear all the questions and I was in the company of individuals that did not need to hear my conversation. I asked the officer to hold on a minute while I went outside to continue the conversation, where there were fewer people. However, I didn't think this was the time or place for us to have the conversation, which was conveyed to the officer, but the officer proceeded with the questioning and I was uncomfortable and felt I was being badgered.

After my conversation with the police officer on the above date I was not contacted by the police officer or the courts on behalf of Ukiah Atkins on any future dates pertaining to this case.

SR.265.

In further support of the motion, Atkins submitted a copy of what appeared to be the 911 call log indicating that on March 18, 2003, the initial call regarding the shooting came in at 20:05:47, i.e., 8:05 p.m. SR.267. Atkins argued that, together, these two exhibits established an alibi defense because it was physically impossible for him to commit the crime at 706 West Main and then travel to Maplewood Avenue, which he characterized as the other side of town, and be at home with his girlfriend and her mother[2] at the time in question.

In opposition to the 440 Motion, the prosecution cited the RPD's Investigative Action Addendum Report #03-083117 ("Report Addendum"), dated March 29, 2003. The Report Addendum stated, in relevant part, as follows:

Inv. Galetta again tried to contact Fuller by calling her cell phone. (Atkins provided the number . . . ). RI did speak to Fuller during which she explained that Atkins was with her the week before. RI tried to obtain any specific outing, time, or land mark they would have been out together which she could not provide. With the exception of getting movies at Blockbuster, she couldn't recall any specific outing during the week they were together. She ended up making the blanket alibi that Atkins was with her every night, all the time. (RI's recorded our conversation on voice mail feature for later retrieval. It was transferred to cassette).

---

[2]     The only mention of Fuller's mother being an alibi witness occurred in Petitioner's 440.10 affidavit, wherein he said that Fuller's mother was "a guest" at the home they shared at 211 Maplewood Avenue. SR.256.

SR.274.

The prosecution argued that the Report Addendum demonstrated that Fuller's generalized alibi statements to Investigator Galetta lacked probative value and established a reasonable basis for Trial Counsel's decision not to pursue a defense based on Fuller as an alibi witness.

In reply, Atkins cited to excerpts from the transcript regarding court appearances on May 23, 2003, and August 26, 2003. SR.282-84. He argued that Trial Counsel "abandoned" the alibi defense only because she negligently failed to file a timely notice of alibi and forfeited Atkins' ability to present Fuller as an alibi witness.

The 440 Court denied the motion on the merits in a written decision dated April 22, 2009. SR.245-52. In particular, the 440 Court noted "the significant, recent improvements" in Fuller's memory "almost six years after defendant's trial and sentencing," which "cast[] serious doubts on the trustworthiness of the specific elements of the alibi claim, especially since, at a prior time, namely 11 days following the murder, she could only generally recall that defendant was with her 'every night, all the time,' without providing any details which could be verified by police investigators." SR.249. Moreover, the 440 Court observed, Fuller "never declare[d] that these new, specific details concerning [Petitioner]'s whereabouts on the date in question were ever provided to anyone, including Inv. Galetta, nor d[id] she mention her mother's presence" when she spoke to the police in March 2003 or in her recent letter. SR.249.

The 440 Court also found it noteworthy that while Fuller "recount[ed] a telephone conversation with an RPD police officer which took place on March 29th, the letter d[id] not relate . . . anything that [she] told the officer in response to his questions about where the defendant was on the date of the murder[,]" and thus, "[t]he information set forth in the

Investigative Action Addendum Report regarding such conversation [stood] uncontroverted." SR.249. In addition, Fuller's recent letter "appear[ed] to contradict her previous statements to police that defendant was with her every night, all the time, since she aver[red] [in the letter] that on that date, defendant did not arrive at her home until approximately 8:00 P.M." SR.249-50.

Additionally, the 440 Court determined, the trial transcripts showed that "defense counsel's decision not file a timely notice of alibi was based expressly on her continuing investigation and a preconceived strategy[,]" as well as Trial Counsel's "awareness of Ms. Fuller's existence and that she had been interviewed by police investigators." SR.251. The 440 Court was "not persuaded" Atkins "had a viable alibi defense" or that Trial Counsel's decision not to call Fuller was "not the result of a well-advised defense strategy." SR.251. In sum, Fuller's statements were "not exculpatory, . . . but rendered the viability of [Petitioner]'s alibi questionable, at best." SR.251.

Atkins filed a *pro se* application for leave to appeal to the Appellate Division. By order dated September 18, 2009, the Appellate Division granted leave on the basis that there were "questions of law and fact which ought to be reviewed" by that court.  SR.240-41.

 The Appellate Division appointed counsel for Atkins, and he filed an appellate brief. SR.374-94. The prosecution filed a brief in opposition. The prosecution argued that the colloquy on August 25, 2003, regarding the alibi notice, *see* T.26-46, demonstrated Trial Counsel was well aware of Fuller's existence and had made a strategic decision not to pursue her as an alibi witness.

Petitioner filed a counseled reply brief, SR.444-49, arguing that the record was bereft of any information regarding what investigation, if any, Trial Counsel undertook regarding Fuller as an alibi witness. For instance, Trial Counsel never directly stated that she

interviewed Fuller or her mother, and did not specify the legal research she had conducted regard the ability to file a late notice of alibi. Because Trial Counsel's strategy remained a mystery, appellate counsel argued, it was impossible to characterize it as reasonable under the circumstances.

The Appellate Division unanimously affirmed the 440 Court's decision on June 7, 2013. SR.451-52. The Appellate Division found that "'[Trial Counsel's] decision not to use an alibi defense, which the District Attorney was prepared to rebut, was a matter of trial strategy and cannot be characterized as ineffective assistance of counsel[.]'" SR.451 (quotation omitted; first alteration in original). Additionally, the Appellate Division found, Atkins "failed to demonstrate that the decision of his trial counsel not to use an alibi defense was 'prejudicial to him'[.]" *Id.* (quotation and citation omitted). Finally, the Appellate Division determined that Atkins "was not entitled to a hearing pursuant to CPL [§] 440.30(5) inasmuch as his factual contentions concerning trial counsel's alleged deficiencies are unsupported by 'any other affidavit or evidence' and, under the circumstances of this case, there is 'no reasonable possibility that [defendant's] allegation[s are] true[.]'" *Id.* (quoting N.Y. Crim. Proc. Law § 440.30(4)(d); second and third alterations in original). Atkins sought leave to appeal, SR.453-57, which the Court of Appeals denied on August 28, 2013. SR.459.

### IV.    The Federal Habeas Proceeding

In his *pro se* Petition, ECF No. 1, Atkins asserted the following grounds for relief: (1) the Trial Court erred in refusing to give a circumstantial evidence jury charge; (2) Trial Counsel was ineffective in conceding that the prosecutor was entitled to present evidence of Petitioner's uncharged crimes; and (3) Trial Counsel was ineffective in failing to investigate Petitioner's alibi witness and failing to file a timely notice of alibi. *See* ECF No. 1 at 7-8.

15

In his answer, Respondent argued that the Petition was untimely, that equitable tolling of the statute of limitations was unwarranted, that the first two claims were unexhausted but must be deemed exhausted and procedurally defaulted, and that all of the claims lacked merit. ECF Nos. 4 & 5.

In a Decision and Order dated April 26, 2017, ECF No. 7, the Court (Telesca, D.J.) agreed that the Petition was untimely, and that Atkins established neither due diligence nor extraordinary circumstances so as to warrant equitable tolling. Judge Telesca dismissed the Petition as untimely and declined to issue a certificate of appealability.

Atkins timely filed a *pro se* notice of appeal. ECF N. 9. The Second Circuit granted a certificate of appealability ("COA") on the following issue: "[W]hether Appellant demonstrated that, in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt, such that the district court could have overlooked the time-bar of his claim that trial counsel was ineffective for not investigating and presenting an alibi defense." The Second Circuit appointed counsel ("Habeas Counsel"), to represent Atkins pursuant to the Criminal Justice Act ("CJA"). Respondent subsequently moved to vacate the COA.

In a summary order dated March 12, 2018, the Second Circuit denied Respondent's request to vacate the COA. Noting that the parties had stipulated to remanding the case to the district court should the COA not be vacated, the Second Circuit vacated the judgment and remanded the case with orders for the district court to "'make specific findings as to whether [Appellant] has established a credible claim of actual innocence.'" ECF No. 13 at 2 (quoting *Rivas v. Fischer*, 294 F. App'x 677, 679 (2d Cir. 2008) (summary order); citations omitted; alteration in original).

The Second Circuit further ordered that, if Atkins "establishes a credible claim of actual innocence,' *Rivas*, 294 F. App'x at 679, the District Court shall proceed to rule on his claim that trial counsel was ineffective for not investigating and presenting an alibi defense. If Appellant does not establish a credible claim of actual innocence, the District Court shall adhere to its prior decision and dismiss the petition as untimely." ECF No. 13 at 2 (citing *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, . . . or, as in this case, expiration of the statute of limitations.")). The Second Circuit's order was entered as a Mandate in this Court on April 3, 2019. ECF No. 13; *see also* ECF No. 28 (amended Mandate correcting date of judgment).

Judge Telesca requested additional briefing from both parties on the following issues: (1) whether Atkins can establish a credible claim of actual innocence; and (2) whether Trial Counsel was ineffective for not investigating and presenting an alibi defense. ECF No. 15. Habeas Counsel filed a letter on July 24, 2019, ECF No. 16, seeking to have the case reassigned to a district judge in this District's Buffalo division, which Judge Telesca denied in a letter dated July 25, 2019, ECF No. 17.

On October 10, 2019, Habeas Counsel filed a Motion for an Evidentiary Hearing, ECF No. 21. Respondent filed a Memorandum of Law in Opposition, ECF No. 23, and Habeas Counsel filed a Reply, ECF No. 24.

On March 12, 2020, the matter was transferred to the undersigned. *See* ECF Nos. 25, 26. A status conference was held telephonically on April 24, 2020, at which Habeas Counsel requested permission to file a supplemental memorandum of law. ECF No. 30. The Court granted the request and set a filing deadline of May 15, 2020. *Id.*

On May 14, 2020, Habeas Counsel sought an extension of time until June 26, 2020, to file his supplemental memorandum of law, ECF No. 31, which Respondent opposed, ECF No. 32. In a text order entered June 23, 2020, the Court granted the extension until June 26, 2020, as requested, and cautioned that "[n]o further extensions of that date will be granted." ECF No. 34.

On July 9, 2020, Habeas Counsel filed a Declaration, ECF No. 35, in support of the Motion for Hearing, ECF No. 21. Habeas Counsel reiterated his position that, in order to comply with the Second Circuit's mandate, the Court must order an evidentiary hearing to receive the live testimony from Fuller. In addition, Habeas Counsel requested that Petitioner be afforded time to obtain third-party discovery in the form of (1) documents purportedly generated by the Monroe County District Attorney's Office in connection with the investigation and prosecution of Atkins' case, that are not part of the appellate record or the record in connection with the collateral proceeding; and (2) sealed documents from a disciplinary proceeding in the Appellate Division that resulted in the imposition of discipline against Trial Counsel in 2002. *See generally* ECF No. 35 at 1-2, 15. Habeas Counsel also asked the Court to "excuse this tardy filing." *Id.* at 2.

On July 10, 2020, Respondent filed a Motion, ECF No. 36, to Strike the Declaration as untimely.  Habeas Counsel filed a Response in Opposition. ECF No. 37. On August 18, 2020, Habeas Counsel filed a Second Supplemental Declaration, ECF No. 38, which attached, as an Exhibit, a "Declaration of Latresha Fuller," ECF No. 38-1. The Declaration is signed and dated August 17, 2020, and attaches Fuller's October 7, 2008 statement. In the Declaration, Fuller simply acknowledges that she signed the attached statement and "reaffirm[s] that all matters set forth therein are true." ECF No. 38-1 at 2.

On August 24, 2020, the Court issued a text order indicating it was considering the parties' submissions and that a decision on the pending applications would follow.

## DISCUSSION

### I.      Respondent's Motion to Strike

Respondent has moved to strike Habeas Counsel's July 9, 2020 Declaration, ECF No. 35, as untimely because it was filed nearly  two weeks after the June 26, 2020 deadline imposed by the Court, and without Habeas Counsel requesting an enlargement of time to file before the deadline expired. *See* ECF No. 36 at 2-4.

"Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced." *Houston v. Lack*, 487 U.S. 266, 282 (1988). Thus, "[a] filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day." *Id.*

Under the Federal Rules of Civil Procedure, if a party "fails to obey a scheduling or other pretrial order," a court may "strik[e] pleadings in whole or in part" as a sanction. *See* Fed. R. Civ. P. 16(f) (C)("On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order."); Fed. R. Civ. P. 37(b)(2)(A)(iii) (authorizing a court, as a sanction for failing to obey a discovery order, to "strik[e] pleadings in whole or in part").

Federal Rule of Civil Procedure 6(b) ("Rule 6(b)") allows a court to extend any deadline "for good cause" if a request is made "*before* the original time or its extension expires." Fed. R. Civ. P. 6(b)(1)(A) (emphasis supplied). An extension may be granted retroactively if it is "on motion" and the litigant demonstrates "excusable neglect." Fed. R.

Civ. P. 6(b)(1)(B). A litigant's "failure to follow the clear dictates of a court rule will generally not constitute such excusable neglect." *Canfield v. Van Atta Buick/GMC Truck, Inc.*, 127 F.3d 248, 250-51 (2d Cir. 1997) (citing *Kyle v. Campbell Soup Co.*, 28 F.3d 928, 931–32 (9th Cir. 1994) (holding that, where counsel failed to offer a persuasive justification for failing to comply with Fed. R. Civ. P. 6 and local court rules, there was "no basis for deviating from the general rule that a mistake of law does not constitute excusable neglect")).

Because Habeas Counsel's request for an extension of time was not made before the original filing deadline expired, he must show "excusable neglect" under Rule 6(b)(1)(B). As an initial matter, the Court notes that Habeas Counsel has never made an extension request "on motion," as specified in Rule 6(b); rather, the late-filed Declaration merely asserts in passing that the delay should be excused. Most importantly, though, Habeas Counsel has failed to demonstrate excusable neglect.

In *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993), the Supreme Court articulated four factors to be considered when determining if a party has shown "excusable neglect" in missing a court-ordered deadline: (1) "the danger of prejudice" to the party opposing the extension; (2) "the length of the delay and its potential impact on judicial proceedings"; (3) "the reason for the delay, including whether it was within the reasonable control" of the party seeking the extension; and (4) whether the party seeking the extension "acted in good faith." *Id.* at 395. While "excusable neglect" "clearly is broad enough to encompass even those omissions caused by circumstances within the movant's control[,]" *In re Painewebber Ltd. Partnerships Litig.*, 147 F.3d 132, 135 (2d Cir. 1998) (citing *Pioneer Inv. Servs. Co.*, 507 U.S. at 392), the movant nonetheless "must show good faith and a reasonable basis for noncompliance." *Id.* (citation omitted). "A court will also consider the degree of prejudice to the opposing party." *Id.* (citation omitted). However, "if a party fails

to demonstrate excusable neglect, its motion will not be granted merely because the other party has made no complaint of bad faith or that it would be prejudiced by the delay." *Steward v. City of N.Y.*, No. 04-CV-1508 CBA RML, 2007 WL 2693667, at \*5 (E.D.N.Y. Sept. 10, 2007) (citing *Lastra v. Weil, Gotshal & Manges LLP*, No. 03 Civ. 8756, 2005 WL 551996, at \*4 (S.D.N.Y. Mar. 8, 2005)).

Habeas Counsel argues that the late filing on July 9, 2020, should be excused because he did not determine the necessity of retaining an investigator to locate Fuller until early May 2020. He asserts that due to his unfamiliarity with the Court's CJA e-voucher system, he was not able to obtain approval for that expense until June 9, 2020; he finally spoke to Fuller on July 2, 2020. *See* ECF No. 37 at 2-4. Respondent counters that this explanation is not credible, given that Fuller is the alleged alibi witness whom Petitioner has been seeking to present at a proposed evidentiary hearing since he filed his motion in October 2019. Habeas Counsel responds that he had been in contact with Fuller prior to May 2020, but then in early spring of 2020, Fuller "disappeared," necessitating the retention of an investigator to locate her.

Even accepting as true Habeas Counsel's assertions regarding Fuller, they do not come close to establishing "excusable neglect" for disregarding the Court's order and failing to file a proper motion for an extension of time. First of all, it is unclear why Habeas Counsel needed to speak to Fuller before filing his Declaration, which offers no new information whatsoever from Fuller about the alleged alibi or her anticipated hearing testimony. While Fuller's brief, three-paragraph Declaration "reaffirm[s]" the truth of her unsworn 2008 letter, it does not assert that she is willing to testify to the contents of the letter under oath. As the information from Fuller that Habeas Counsel has included is neither new nor material, it does not strengthen his Motion for a Hearing. Moreover, Fuller is irrelevant to the eleventh-hour

requests for discovery Habeas Counsel makes in the Declaration for access to sealed disciplinary records involving Trial Counsel and investigative materials allegedly generated by the prosecutor's office.

Second, even assuming that the need to locate and speak with Fuller was an "extenuating circumstance" as alleged by Habeas Counsel, that only covers a portion of the delay. Habeas Counsel did not file his Declaration until July 9, 2020, nearly two weeks after the June 26, 2020 deadline, and a week after speaking with Fuller. Habeas Counsel offers no reason for the delay between his purportedly crucial conversation with Fuller and his filing of the Declaration. Moreover, he has not explained why his "problems [in locating Fuller] prevented [him] from at least filing timely motions for extensions of time, which need not be complicated or extensively researched." *King v. Moore*, No. 11-CV-1290, 2012 WL 13005481, at *2 (C.D. Ill. May 14, 2012) (noting that the "old adage that it's easier to ask forgiveness than permission . . . is certainly not true in this Court, which is extremely lenient with timely requests for more time, but which has little patience for such motions filed after time has expired").

The Court further finds that equity supports striking the untimely Declaration, which is replete with speculation and offers nothing to bolster Petitioner's request for an evidentiary hearing. Instead, it makes discovery requests which do not promise to unearth any information actually relevant to the actual-innocence determination, and which Habeas Counsel could have pursued much earlier in this proceeding. Striking the Declaration from the record will not hinder this Court's ability to adjudicate the issues presented on remand.

As a final note, Respondent correctly points out that this is not the first time Habeas Counsel failed to request an extension of time prior to missing a scheduling deadline. In July 2019, after this case was remanded, Judge Telesca ordered Petitioner to file supplemental

briefing by August 15, 2019, with Respondent's response due by September 4, 2019.  ECF No. 15. On October 1, 2019, well after Petitioner's deadline had passed and the matter had been deemed submitted, ECF No. 18, Habeas Counsel asked the Court to set new deadlines. ECF No. 19. While Habeas Counsel's request was accommodated at that time, the Court is not inclined to give Habeas Counsel another pass.

After considering all of the circumstances, the Court finds that Habeas Counsel does not have "a reasonable basis for noncompliance" with the filing deadline, and, accordingly, has failed to demonstrate "excusable neglect" so as to justify his informal request in his belated Declaration for an extension of time to file. Accordingly, the Court declines to extend the deadline *nunc pro tunc* under Rule 6(b) and grants Respondent's Motion to Strike the Declaration. *See   Hidalgo v. New Ichiro Sushi, Inc.*, No. 15-CV-414 (AJN), 2017 WL 4712789, at *4 (S.D.N.Y. Sept. 27, 2017) (granting defendant's cross-motion for summary judgment where defendant's counsel had a "history of late filings,"  and the offered excuses "do not explain counsel's repeated failures to request extensions *prior* to the expiration of deadlines") (emphasis in original); *see generally Barclay v. Doe*, 207 F. App'x 102, 104 (2d Cir. Dec. 5, 2006) (unpublished opn.) ("[A]ll litigants . . . have an obligation to comply with court orders. When they flout that obligation they . . . must suffer the consequences of their actions.").

II.     **The Issue on Remand**

A. **Actual Innocence as a "Gateway" for Time-Barred Claims**

In *Rivas*, the Second Circuit held "that a petitioner who satisfies the Supreme Court's actual-innocence standard may pass through the *Schlup*[*v. Delo*, 513 U.S. 298 (1995),] gateway and have his substantive claims heard on the merits, notwithstanding an otherwise unexcused delay in filing his habeas petition." *Rivas*, 687 F.3d at 540. Atkins' "actual

innocence claim plays a 'procedural, not substantive' role in this case[,]" *Hyman v. Brown*, 927 F.3d 639, 655 (2d Cir. 2019) (quoting *Rivas*, 687 F.3d at 541), because "[e]ven if successful, the claim cannot itself afford [him] habeas relief from his state conviction. *Id.* (citing *Schlup*, 513 U.S. at 314).

To satisfy the *Schlup* standard, a claim of actual innocence must be both 'credible' and 'compelling.'" *Rivas*, 687 F.3d at 541 (quoting *House v. Bell*, 547 U.S. 518, 521, 538 (2006)). "For the claim to be 'credible,' it must be supported by 'new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" *Id.* (quoting *Schlup*, 513 U.S. at 324; citing *House*, 547 U.S. at 537). "For the claim to be 'compelling,' the petitioner must demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Id.* (quoting *House*, 547 U.S. at 538).

### B.  Petitioner's New Evidence Is Neither "Credible" Nor "Compelling"

As an initial matter, the Court must consider whether Fuller's 2008 letter asserting an alibi for Atkins is truly "new" evidence given that the defense knew of her existence in March of 2003, when she provided information to the RPD investigators regarding Atkins' whereabouts. "The circuit courts are split on whether 'new' includes only 'newly discovered' evidence—evidence that was not available at the time of trial—or more broadly encompasses 'newly presented' evidence—all evidence that was not presented to the jury during trial." *Lopez v. Miller*, 915 F. Supp.2d 373, 400 n. 16 (E.D.N.Y. 2013) (comparing, *inter alia*, *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) ("Evidence is only new if it was not available at trial and could not have been discovered earlier through the exercise of

due diligence.") (internal quotation marks omitted); *with Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) ("All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial."); other citations omitted)).  In *Rivas*, the Second Circuit "did not discuss the issue in detail, but appears to have taken the 'newly presented'' side of the circuit split. . . ." *Id.* (citing *Rivas*, 687 F.3d at 543 (referring to "new evidence—that is, evidence not heard by the jury")).

Fuller's 2008 letter clearly was "evidence not heard by the jury[,]" *Rivas*, 687 F.3d at 543. In any event, even under the "newly discovered" reading, it arguably was not reasonably available to Atkins at trial since, when asked by the RPD investigator in March 2003, if she could substantiate Atkins' whereabouts on the night of the murder, Fuller gave a different answer than she later gave in August 2008. The Court therefore will consider Fuller's letter to be "new" evidence and will proceed to consider whether it is "reliable." *See Schlup*, 513 U.S. at 331 (noting that, if found to be reliable, the sworn statements of two people "that cast doubt on whether [the petitioner] could have participated in the murder" based on his whereabouts around the time of the crime would support his actual innocence claim).

The letter from Fuller is dated October 7,  2008, about five years after the murder on March 18, 2003, and her conversation with Investigator Galetta on March 29, 2003. The Court finds that the belatedness of Fuller's letter greatly undermines its reliability. *See Fabers v. Lamanna*, No. 18-CV-2399 (PKC), 2020 WL 1875288, at *23 (E.D.N.Y. Apr. 15, 2020)  ("The reliability of Joseph's affidavit [providing alternative narrative in support of actual innocence claim] is further undermined by the fact that it was provided more than six years after the events in question.") (citing *Rosario v. Ercole*, 582 F. Supp.2d 541, 601 (S.D.N.Y. 2008) ("[W]hile the prosecution's witnesses testified to events that occurred over

two years prior, petitioner's post-conviction hearing witnesses testified to events that occurred about six years prior. Even where petitioner's witnesses may have absolutely no intention of misleading the court, six-year old memories are inherently not as reliable as two and a half-year old ones."), *aff'd*, 601 F.3d 118 (2d Cir. 2010)).

Fuller offers various reasons why she failed to mention the particular details in her 2008 letter when she previously spoke with the police on March 29, 2003.  In particular, Fuller's letter states that she was at a family birthday party when the officers telephoned her; that it was "hard to hear all the questions"; that she didn't think it was "the time or place" for them to have the conversation; and that she "was uncomfortable and felt [she] was being badgered."  These statements are not credible.  The police had called to ask Fuller whether she could provide an alibi for Atkins, her live-in boyfriend, in connection with a murder investigation.  Under those circumstances, it could reasonably be expected that Fuller would have told the officers everything that she could remember, or that she at least would have followed up with the police at a more convenient time *prior to* Atkins' trial and conviction,[3] rather than five years afterward.   Indeed, Fuller offers no reason for why she waited five years, other than to shift blame by stating that no one *contacted her*.  Again, that explanation is not credible.  The police had already contacted her, and she told them that she could not remember anything specific.  Consequently, there would have been no reason for them to contact her again.  If she later recalled specific details, as she now claims, one might expect that she would have recalled them sooner than five years later, and that she would have immediately provided the information to either the police, Atkins' attorney or Atkins himself. This failure to convincingly explain Fuller's delay in coming forward weighs against finding

---

[3] The trial took place six months after Fuller spoke with police, during which time she continued to speak with Atkins, who was in jail.

that Atkins has made the requisite showing. *See, McQuiggin v. Perkins*, 569 U.S. 383, 399, 133 S. Ct. 1924, 1935, 185 L. Ed. 2d 1019 (2013) ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing.").

Moreover, Fuller's letter lacks two major indicia of reliability. First, while it is notarized, it is unsworn. Second, it is uncorroborated by any other evidence. Although Atkins asserted in the 440 Motion that Fuller's mother was staying at her house, Fuller's letter—submitted by Atkins in support of that motion—notably did not mention her mother. Moreover, Fuller's mother has never come forward with any statement, sworn or unsworn, in support of Atkins' alibi. *See Barrientos v. Lee*, No. 14CV3207-LTS-JCF, 2015 WL 3767238, at *12 (S.D.N.Y. June 17, 2015) (purportedly exculpatory statement by former co-defendant made during an interrogation "lack[ed] several indicia of reliability: the statement was only informally memorialized in handwritten notes . . . and is uncorroborated by other evidence"). In sum, the Court finds that Fuller's letter is not sufficiently credible to support Atkins' claim of actual innocence.

Even assuming *arguendo* that the Fuller's letter was credible, it is not compelling, and therefore cannot constitute new, reliable evidence of actual innocence. While describing the *Schlup* actual innocence standard as "somewhat cryptic[,]" *Rivas*, 687 F.3d at 541 (citing *Schlup*, 513 U.S. at 339 (Rehnquist, C.J., dissenting)), the Second Circuit found "some clarity" in the Supreme Court's statements "contrasting the gateway standard from . . . more familiar [standards]." *Id.* For instance, "[t]he petitioner [raising a gateway innocence claim] . . . is required to make a stronger showing than that needed to establish prejudice[,]" *Schlup*, 513 U.S. at 327 & n.45 (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("The defendant[, in order to show prejudice,] must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have been different."); other citations omitted).

On the other hand, *Schlup*'s gateway standard is "by no means equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 . . . (1979), that governs review of claims of insufficient evidence." *Schlup*, 513 U.S. at 330 (parallel citations omitted). Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact *could* have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (first emphasis in original; second emphasis supplied). "Whereas, '[u]nder *Jackson*, the use of the word "could" focuses the inquiry on the *power* of the trier of fact to reach its conclusion,' the use of the word 'would' in the *Schlup* standard '"focuses the inquiry on the *likely* behavior of the trier of fact."'" *Rivas*, 387 F.3d at 542 (quoting *Schlup,* 513 U.S. at 330; emphases added in *Rivas*).

The *Schlup* inquiry further diverges from *Jackson* insofar as "[a] court reviewing the sufficiency of the evidence supporting a conviction is limited to considering the evidence actually presented at trial, and must view that evidence in the light most favorable to the prosecution[,]" *Rivas*, 387 F.3d at 542, but "[a] court reviewing a gateway claim of actual innocence  . . . [must] 'assess how reasonable jurors would react to the overall, newly supplemented record.'" *Id.* (quoting *House*, 547 U.S. at 538–39; internal citations and quotation marks omitted in original). The *Schlup* standard "therefore requires reviewing courts to 'consider all the evidence, old and new, incriminating and exculpatory,' and, viewing the record as a whole, to 'make a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *House*, 547 U.S. at 538; internal citations omitted in original).

As this Court understands the foregoing principles, it must consider both Investigator Galetta's report memorializing his conversation with Fuller on March 29, 2003, and Fuller's unsworn August 27, 2008 letter, along with the rest of the testimony and evidence presented at trial.  The Court then must assess how reasonable jurors would react to the "newly supplemented record." *Rivas*, 387 F.3d at 542 (quotation omitted). Notably, "'[i]f new evidence so requires, this [assessment] may include consideration of the credibility of the witnesses to be presented at trial.'" *Id.* (quoting *House*, 547 U.S. at 538–39 (internal citations and quotation marks omitted in original).

Turning first to the evidence presented at trial, the Court recognizes that the prosecution's chief witness, Bowe, was an admitted crack addict with a criminal record. While perhaps not a model citizen, he was—unlike Fuller—an uninterested witness. Bowe neither had a personal relationship with Atkins nor any axe to grind with him. It was apparent that Bowe was reluctant about testifying against Atkins; at one point he became upset on the stand, stating he could not go through with his testimony. T.518-19, 521. In addition, Bowe's participation in Atkins' trial came at some personal cost to him. Out of fear for his safety, he testified, he requested and received assistance from the RPD in relocating outside of Rochester.

Bowe provided specific and detailed testimony about (1) his conversation with Atkins prior to the shooting, and (2) his observation, moments after the shooting, of Atkins holding a gun and fleeing from the building. Bowe's testimony about these events was internally consistent and essentially unimpeached.

In contrast, Fuller's two statements were internally inconsistent. In March 29, 2003, she told Investigator Galetta that Atkins was with her "every night, all the time." However, in her August 27, 2008 letter, she said that he arrived home at 8 p.m. on March 18, 2003, which

means that he was not at home prior to 8 p.m., and thus was not with her "all the time." The plausibility of the alibi provided by Fuller in 2008 is called into question by the utter lack of detail in the earlier-given alibi; it defies common sense that Fuller's memory would actually be sharper five years *after* the night at issue.

Moreover, even if credited, the later-provided alibi does not necessarily prove Atkins' innocence. It is undisputed that immediately prior to the shooting, Atkins had a conversation with Bowe that was significantly inculpatory: Atkins specifically asked Bowe whether Shay was one of the "young uns" selling drugs at 706 West Main, a place where he had sold drugs in the past. When Atkins learned she was, he stated that he was going "teach them a lesson." That conversation occurred about an hour prior to the shooting, which was called in to 911 at about 8 p.m. *See* Petitioner's Motion for Evidentiary Hearing at 4, ¶ 10 ("Greg Bowe testified at trial that he, on parole, and petitioner, acquaintances, having seen the other unexpectedly on the street, parted ways after a chat of a few minutes during which petitioner delivered what sounded to Bowe like a threat against Porter, who was not present and whom both knew. *About an hour later* when the shooting occurred. . . .") (emphasis supplied). Fuller's statement that Atkins arrived at her apartment "at *approximately* 8:00 pm" does not disprove the conversation described by Bowe and does not necessarily show that Atkins was home at the exact time of the shooting.

Finally, the fact that the prosecutor possessed a recording of a jailhouse telephone call between Atkins and Fuller cannot be ignored. When the Trial Court reserved decision on the late notice of alibi issue, the prosecutor stated that if the defense were permitted to call Fuller as an alibi witness, he would introduce evidence of the phone call. Habeas Counsel now objects that the recording of the jailhouse telephone call, a copy of which was proved to him by Respondent, but which is not in the record and thus cannot be considered.

Declaration (ECF No. 35) at 14, ¶ 36. He further states that Petitioner "has never heard it to [his] knowledge[,]" and therefore is "unavailable to assist [him] in understanding all that is meant." *Id.* At the same time, Habeas Counsel asserts, the recording "shows no contriving [to fabricate] that [he] can see." *Id.*  However, if there were nothing potentially impeaching or inculpatory in that recording, then there should be no need for Petitioner's interpretative assistance regarding "all that is meant" by the conversation between Fuller and himself. Petitioner's assertion that the actual meaning of phone call requires additional clarification actually strengthens the inference that it is unfavorable to the defense.

Even without knowing the exact contents of recording, the only reasonable inference from the prosecutor's announcement that he would use the recording to rebut Fuller's alibi evidence is that Atkins and Fuller discussed her alibi evidence during the call, and that the substance of their discussion would undermine the alibi's veracity.   After all, the very "function and purpose of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party." *United States v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974) (cited with approval in *United States v. Neary*, 733 F.2d 210, 220 (2d Cir. 1984)). Petitioner has suggested no reason why the recording would have been excluded by the Trial Court had the defense called Fuller as an alibi witness. *See Velazquez v. Fischer*, 524 F. Supp.2d 443, 451 (S.D.N.Y. 2007) ("New York courts have consistently found that a challenge to the validity of an alibi defense is a material issue, and thus extrinsic rebuttal evidence is permitted.") (citing, *inter alia*, *People v. Knight*, 80 N.Y.2d 845, 847 (1992)); *People v. Spencer*, 20 N.Y.3d 954, 956 (2012) ("[P]rovided that counsel has a good faith basis for eliciting the evidence, 'extrinsic proof tending to establish a reason to fabricate is never collateral and may not be excluded on that ground. . . .'"); internal quotation and citations omitted).

For all of these reasons, the Court finds that Atkins has failed to "demonstrate that 'more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" *Rivas*, 687 F.3d at 541 (quoting *House*, 547 U.S. at 538). Because Atkins has failed to establish a "credible" and "compelling" claim of actual innocence, he cannot pass through the *Schlup* "gateway" to a hearing on the merits of his untimely Petition.[4]

## CONCLUSION

For the foregoing reasons, the Petitioner's Motion for a full Evidentiary Hearing (ECF No. 21) is DENIED; Respondent's Motion to Strike (ECF No. 36) the Declaration (ECF No. 35) is GRANTED, and the Petition (ECF No. 1) is DISMISSED as untimely.  Furthermore, because Petitioner has failed to make the required showing, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). Accordingly, The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

_____
CHARLES J. SIRAGUSA
United States District Judge

Dated: October 23, 2020
       Rochester, New York.

---

[4] Although the Court would be inclined to continue and explain why, in the alternative, the petition also lacks merit, the Court will not do so, in accordance with the direction of the Second Circuit. *See*, Amended Mandate, ECF No. 28 at p. 2 (" It is further ORDERED that, if Appellant establishes a "credible claim of actual innocence," *Rivas*, 294 F. App'x at 679, the District Court shall proceed to rule on his claim that trial counsel was ineffective for not investigating and presenting an alibi defense. If Appellant does not establish a credible claim of actual innocence, the District Court shall adhere to its prior decision and dismiss the petition as untimely.").